**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| Nimol Holdings Ltd.; Echelon DC Marion LLC; Echelon DC Marion Extension LLC; Echelon DC Bennettsville LLC, | ) ) ) | Case No.: _____ |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | **COMPLAINT** |
| vs. | ) ) | |
| MPD Electric Cooperative, Inc.; Marlboro Development Team, Inc. | ) ) ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs Nimol Holdings Ltd. ("Nimol"), Echelon DC Marion LLC ("EDC Marion"), Echelon DC Marion Extension LLC ("EDC Marion Extension"), and Echelon DC Bennettsville LLC ("EDC Bennettsville") (collectively, "Plaintiffs") hereby file their Complaint against Defendants MPD Electric Cooperative, Inc. ("MPD") and Marlboro Development Team, Inc. ("MDT") (collectively, "Defendants") and allege as follows:

## PRELIMINARY STATEMENT

Plaintiffs sought to build and lease industrial, large scale data centers in four counties in the Pee Dee Region of South Carolina. Collectively, Plaintiffs were prepared to invest billions of dollars in real property, facilities construction, sophisticated equipment, infrastructure upgrades, and, perhaps most importantly to the people of the Pee Dee, jobs. The proposed projects, if completed, would be some of the largest economic investments in South Carolina history. Plaintiffs, through their extensive experience and industry contacts, brought this opportunity to the Pee Dee.

Plaintiffs selected sites to implement their plans and commenced working with Defendants, the Pee Dee's primary electric cooperative and its subsidiary real estate development company, to bring these plans to fruition. Defendants represented themselves as experienced, trustworthy

partners—professionals who would never "surprise them in any negative way." Defendants asked the Plaintiffs to trust them and to rely on them. Plaintiffs did just that, incurring millions of dollars in due diligence and other pre-development costs.

For over a year, Defendants obtained intimate knowledge of the inner workings of the Plaintiffs' data center development business and Plaintiffs' proprietary development process. At the eleventh hour, and without any apparent explanation or justification, Defendants made outrageously off market demands and, upon information and belief, took steps to intentionally destroy any prospect of the projects coming to fruition by wrongly refusing to close on certain property critical to the deal. While Plaintiffs earnestly tried to salvage the deal, Defendants refused to work with Plaintiffs in good faith.

Eventually, it became apparent that the Defendants had other plans. Notwithstanding the millions of dollars and countless man hours invested by Plaintiffs, it appears that the Defendants improperly used Plaintiffs' and their customer's confidential and proprietary information, along with Defendants' position of trust and influence in the region, to coopt the data center development plans to complete the project without Plaintiffs. This lawsuit seeks to right this wrong.

## **PARTIES**

1.     Plaintiff Nimol is an Irish corporation with its principal place of business in Ireland.

2.     Plaintiffs EDC Marion, EDC Marion Extension, and EDC Bennettsville are each limited liability companies organized and existing pursuant to the laws of South Carolina.

3.     Defendant MPD is a nonprofit electric member cooperative organized and existing pursuant to S.C. Code Ann. §§ 33-49-10, *et seq.* (the "Electric Cooperative Act") with a principal place of business in Florence County, South Carolina.

2

4.      Defendant MDT is a corporation organized and existing under the laws of the State of South Carolina and, upon information and belief, is a subsidiary of MPD with a principal place of business in Florence County, South Carolina.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there exists complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

6.      Echelon DC US Holdings LLC is a Delaware limited liability company, has a principal place of business in Ireland, and is the sole member of EDC Marion, EDC Marion Extension, and EDC Bennettsville.

7.      Echelon DC US Inc. is a Delaware corporation, has a principal place of business in Ireland, and is the sole member of Echelon DC US Holdings LLC.

8.      Thus, there is complete diversity between the Plaintiffs and the Defendants.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside in, and a substantial part of the events or omissions giving rise to the claims in this action occurred in, this district and division.

## FACTS

I.     **Background.**

10.     Nimol develops and operates large-scale data center infrastructure assets, and its portfolio consists of data center and power generation and storage facilities in Ireland, the United Kingdom, Europe, and North America.

11.     In 2023, while Nimol was exploring potential locations in the United States to expand its portfolio, representatives of Nimol met William Fleming, Jr. ("Fleming"), who is the President and Chief Executive Officer ("CEO") of MPD and MDT. After that meeting, Nimol and

Fleming began discussing the idea of Nimol developing data centers in South Carolina that Nimol would ultimately lease to end-user customers.

12.     Because of Fleming's role as President and CEO of MPD and MDT, and the data centers' electrical power needs, Nimol believed that Fleming was qualified to assist with developing projects in South Carolina's Pee Dee Region.

13.     Throughout the discussions between Nimol and Fleming, and in apparent attempts to entice Nimol to develop data centers in MPD's service area, Fleming repeatedly assured Nimol that MPD would be able to meet Nimol's power needs, and that MDT could assist in all aspects of project development. Fleming, on behalf of MPD and MDT, made a number of assurances to Nimol, including, but not limited to, "we can meet your needs"; "[t]his is your business, we will take your lead to make it perfect so you guys can sell it to your customers"; "the ramp up schedule is exciting; not frightening. I feel confident that we can hit these marks"; "my team stands at your disposal whenever you need something - we welcome the work; nothing is too taxing"; and "[w]e absolutely promise that we will not disappoint you guys or surprise you in any negative manner."

**II.     Initial Properties Identified by Fleming.**

14.     Fleming identified certain properties throughout MPD's service area that he believed would be appropriate sites for Nimol's data centers based on available acreage and power availability.

15.     On October 18, 2023, MPD sent a letter to Nimol in which MPD committed to providing the required capacity of 1 GW, through its wholesale suppliers Santee Cooper and Duke Energy, at a proposed rate of $58–64 per MWh at sites located in Darlington County identified by Tax Map Number 131-00-01-014 (the "Darlington Property"), Dillon County identified by Tax Map Number 068-00-00-007 (the "Dillon Property"), and Marlboro County identified by Tax Map Number 040-00-01-044 (the "Bennettsville Property").

4

16.     On October 20, 2023, letters from officials for Darlington, Dillon, Florence, and Marlboro Counties expressing support for Nimol's development of data centers within the respective counties were sent to Nimol.

17.     On December 15, 2023, MPD sent a letter from Marion County to Nimol in which Marion County committed to providing a parcel identified by Tax Map Number 055-00-00-021-000 for free as an incentive for Nimol's project (the "Marion Property").

III.     **MDT Agrees to Manage Nimol's Due Diligence Activities.**

18.     On February 26, 2024, Nimol and MDT entered into a Due Diligence Services Agreement (the "DDSA") in which MDT acknowledged that Nimol was currently negotiating with various governmental and private entities to construct data centers across the Pee Dee region of South Carolina ("Project Diamond").

19.     In the DDSA, MDT agreed to provide, among other things, "[a]ny and all services and information that may be commercially required or otherwise necessary by [Nimol] . . . to enable [Nimol] to conduct their master planning of the Project to include the development of all of the campuses."

20.     In exchange for these services, Nimol paid MDT a fee equal to 10% of the selected third-party vendors' invoices for performing the diligence activities.

21.     MDT agreed in the DDSA that MDT would not disclose "Confidential Information" to third parties or use it for any purpose except to perform the services outlined in the DDSA. The DDSA defines "Confidential Information" to include "all information, documentation and materials which has been delivered by [Nimol] to MDT (whether or not marked as confidential), including, but not limited to, products, information relating to [Nimol's] prospective and existing customer lists, operations, facilities, computer systems, finances, product development plans, and business directions or marketing plans."

22.     MDT further agreed in the DDSA that "[a]ll project deliverables, permits, drawings, specifications, written reports, patents, copyrights, trade secrets and other property rights . . . (hereinafter collectively referred to as the "Works") shall be owned by [Nimol] and/or Project[,]" and that "MDT shall use the Works and all products and materials supplied to MDT by [Nimol] solely for the benefit of [Nimol] and for no other purpose . . .." (emphasis removed from original).

23.     Pursuant to Section 9.3 of the DDSA, in an action to enforce the provisions of the DDSA, "the prevailing party shall be entitled to its legal costs and fees, including but not limited to, all costs, charges and disbursements, costs of appeal and reasonable attorneys' fees."

**IV.     Marion Recognized as Priority and Santee Cooper Confirms Power Availability.**

24.     On February 29, 2024, the Chief Development Officer ("CDO") for MDT and MDT Holdings, Inc. acknowledged in an email to Nimol representatives, Nimol's counsel, and MPD's and MDT's counsel that of the four properties being pursued by Nimol, the Marion Property was the priority. Commencement on development of the Marion Property was projected to begin 12 months prior to the Bennettsville Property, 24 months prior to the Darlington Property, and 48 months prior to the Dillon Property.

25.     On March 1, 2024, MPD and Nimol entered into a letter agreement in which MPD acknowledged, among other things, that Santee Cooper, after having performed a transmission study, confirmed the availability of 300 MWs and 250 MWs of transmission capacity at the Marion Property and Bennettsville Property, respectively.

26.     On March 22, 2024, the CDO for MDT emailed Nimol and stated as follows:

On the Marion Property, the County has provided documentation in writing that they are committed to give the land to Project Diamond which you have a copy of. As I believe we shared with you earlier, at the suggestion of the County, they will be contracting directly with MDT for land "purchase" and then we will be contracting with [Nimol]. . . . We are in the process of finalizing our agreement with Marion County and having everything executed with them by the end of April.

6

Due to the property being owned by the County, the council has to go through the formal approval process which is already underway. However, in the meantime and in order to expedite the due diligence work that [Nimol] will need to complete, the council has already given formal approval to provide MDT and their agents or designee access to the site to conduct these tests. . . . We are ready to get all four of these under contract as soon as possible also.

**V.    Nimol Pays $3.3 Million Deposit to MPD to Reserve Power for Marion and Bennettsville Properties.**

27.    On March 27, 2024, MPD entered into a Deposit Agreement with EDC Marion and a Deposit Agreement with EDC Bennettsville (collectively, the "Deposit Agreements"), in which EDC Marion agreed to pay MPD $1,800,000 and EDC Bennettsville agreed to pay MPD $1,500,000 to reserve the capacity represented to be available in the March 1, 2024 letter agreement (the "Capacity Deposits").

28.    In the Deposit Agreements, MPD agreed to reserve the available capacity "until either (i) MPD and [Nimol], or an Approved End User, have entered into an Electric Supply Agreement, or (ii) December 1, 2024, whichever event occurs first."

29.    The contemplated "Electric Supply Agreement" would be a service agreement between MPD and Nimol's end user customer setting forth MPD's and the customer's rights and obligations with respect to, among other things, the power to be supplied by MPD and paid for by the customer.

30.    The parties further agreed in the Deposit Agreements that "[i]f MPD is unable, despite using commercially reasonable efforts, to enter into an Electric Supply Agreement with [Nimol] and/or an Approved End User equal to approximately [300 MW for Marion and 250 MW for Bennettsville] of generation capacity as of December 1, 2024, the Transmission Capacity Reservation Charge shall be refunded to [EDC Marion and EDC Bennettsville] in full, less reasonable costs incurred by MPD to the extent such costs have not already been recovered by MPD from [Nimol]. . . ."

31.     Both Deposit Agreements also contained a confidentiality provision agreeing to use Confidential Information only for purposes contemplated by the Deposit Agreements and a cooperation provision, in which "[e]ach party to this Agreement shall reasonably cooperate with the other as to all aspects relating to the performance of its respective obligations under this Agreement."

32.     On April 5, 2024, Nimol made payment to MPD on behalf of EDC Marion and EDC Bennettsville in the amount of $3,300,000 for the Capacity Deposits.

**VI.     EDC Marion Entities and MDT Enter Purchase Agreements for Marion Properties.**

33.     On April 4, 2024, EDC Marion and MDT entered into an Agreement to Purchase Real Estate for EDC Marion's purchase of the Marion Property (the "Marion PSA").

34.     Under the Marion PSA, the closing date for consummating MDT's sale of the Marion Property to EDC Marion was set to occur on or before January 29, 2025.

35.     On October 11, 2024, EDC Marion Extension (collectively with EDC Marion, the "EDC Marion Entities") and MDT entered into an Agreement to Purchase Real Estate (the "Marion Extension PSA") for EDC Marion's purchase of an additional 195 acres identified by Tax Map Numbers 0440000041000 and 055000003200 (the "Marion Extension Property" and collectively with the Marion Property, the "Marion Properties").

36.     Under the Marion Extension PSA, the closing date for consummating MDT's sale of the Marion Extension Property to EDC Marion Extension was set to occur on or before February 10, 2025.

37.     Under Section 12(b) of both the Marion PSA and Marion Extension PSAs (collectively, the "Marion PSAs"), in the event of an MDT default, the EDC Marion Entities are entitled to "reimbursement by [MDT] for all third-party costs and expenses (as evidenced by paid invoices) incurred by [the EDC Marion Entities] in connection with the Contract or the Property,

8

and will also be entitled to all legal or equitable rights, remedies and procedures available to it at law or in equity, including without limitation, specific performance."

38.     Section 12 of the Marion PSAs further provides "[i]n the event either party brings legal action to enforce the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable legal fees and costs from the losing party."

## VII.   Due Diligence, Ancillary Agreement Negotiations, and Fleming's Unreasonable Dealings.

39.     Over the ensuing months after entering the Marion PSA, extensive diligence and design activities for the Marion, Bennettsville, Darlington and Dillon Properties commenced. Nimol paid millions of dollars to third-party vendors for the necessary due diligence and design activities, including to MDT.

40.     Nimol also entered into an agreement with Utility Innovation Group, LLC ("UIG") for the provision of certain engineering and regulatory advisory and management services. Upon information and belief, Fleming has a direct or indirect ownership interest in UIG. After making significant payments to UIG in exchange for the promised services and not receiving much of the promised work product, it now appears to Nimol that these payments were sought by Fleming for additional compensation that Fleming, MPD, and/or MDT would not otherwise have been entitled to receive.

41.     Throughout this time, the parties also continued to negotiate other ancillary agreements relevant to MPD's provision of power and the future development of the needed infrastructure.

42.     Over the course of those negotiations, Fleming and other employees of MPD and MDT began to gradually assert more and more patently unreasonable terms, often on a take it or leave it basis.

43.     To provide just one example of many, in April 2024, when the parties were negotiating terms for a facilities agreement, which would govern the parties' rights and obligations with respect to the required infrastructure, Fleming insisted that, despite Nimol being responsible for paying tens of millions of dollars for the construction of a required substation at the Marion Property, Nimol could at no time own the work product of the design, the equipment, or the warranties.

44.     After the parties were unable to reach a commercially reasonable deal on the facilities agreement, Nimol attempted in good faith to progress with an Electric Service Agreement ("ESA") governing the parties' rights and obligations with respect to MPD's provision of power to the data centers. During July and August 2024, Nimol discussed with MPD executing a letter of intent for the ESA to progress the overall development of the project. However, after Nimol presented to MPD a draft letter of intent for an ESA on August 7, 2024, MPD responded on August 12, 2024, that it wanted to forego a letter of intent and, instead, enter directly into the ESA. Despite Nimol following up with MPD about the draft ESA many times, MPD did not provide a draft ESA until September 23, 2024. When MPD did finally provide a draft ESA, it contained numerous commercially unreasonable terms.

45.     As another example, when the initial bid for transformers and breakers needed for improving the infrastructure at the respective properties had to be reduced to account for a changed timeline, MPD's Chief Operating Officer ("COO") claimed that he was "concerned about MPD maintaining some market credibility with the manufacturers" and that "we may not get the type of responses we received this time, we may even have some manufacturers decline to bid." The MPD COO then suggested that Nimol increase the equipment up for bid "to maintain our market credibility going forward when its time to make the next group of purchases." However, upon information and belief, there was no basis in fact for MPD to claim that its market credibility was

at risk due to needing to rebid the equipment because it is not uncommon for solicited bids to not be acted upon. Additionally, upon information and belief, the bids were solicited by Cooperative Electric Energy Utility Supply, Inc. ("CEEUS"), of which MPD is a member, and from which MPD receives financial benefits.

46.     Then, when it was time to rebid the equipment, MDT's CDO, at the suggestion of MPD's COO, stated Nimol would have to pay MPD $175,000 to rebid the equipment "to prevent a possible two-month in total delay." Neither MPD nor MDT charged Nimol a fee for the initial bid, and, upon information and belief, it is not commercially reasonable to charge any substantive fee, let alone a $175,000 fee, to solicit equipment bids. Nevertheless, to keep the project moving forward, Nimol complied with MDT's unreasonable demands and paid $175,000 to MPD to rebid the equipment.

47.     Further, throughout October and November 2024, MPD started negotiating an ESA directly with Nimol's prospective customer (the "Customer"), Fleming, on behalf of MPD, failed to negotiate with the Customer in good faith and made numerous unreasonable demands. For example, MPD failed to provide any transparency into the pricing of the power to be provided by Santee Cooper or a schedule of when the required infrastructure could be delivered. Fleming also continued to propose power rates which were above market and insisted on including a number of unreasonable miscellaneous fees for both MPD and MDT.

48.     Because negotiations between the Customer and MPD were not progressing as quickly as hoped due to Fleming's unreasonable demands, the Customer asked to extend the deadline for entering the ESA until December 15, 2024. Fleming agreed.

49.     Knowing the Deposit Agreements contemplated that an ESA between MPD and the Customer would be entered into by December 1, 2024, Nimol contacted Fleming on November

26, 2024, to confirm that MPD would agree to extend its commitment to EDC Marion and EDC

Bennettsville to reserve the power pursuant to the Deposit Agreements until December 15, 2024.

50.    However, Fleming unreasonably refused to provide an extension for the Deposit

Agreements and specifically responded as follows:

> We have made it clear with [the Customer], who requested the extension, that the
> [Deposit Agreement] requires a contract execution of December 1. The capacity is
> not guaranteed after that, but the likelihood someone grabs it within a couple of
> weeks is moderate. Not low or high, but moderate. We've also put our final offer
> on certain matters to [the Customer] today. Any delay for execution is in their
> hands.

> As far as the [Deposit Agreement] between MPD and [EDC Marion and EDC
> Bennettsville], that has not been extended beyond Dec. 1st and we are unwilling,
> nor in a position to do so. So those terms remain in place. We have made this risk
> known to [the Customer] since the beginning as you guys have heard and I hope
> have echoed in your one-on-one conversations.

51.    Then on December 2, 2024—with 13 days remaining for the Customer to

successfully negotiate and enter the ESA with MPD—Fleming emailed Nimol that the "deal [with

the Customer] is dead. . . . So on to the next one. Sorry to be the bearer of bad news."

52.    Because it had expended so much time and resources on the projects, Nimol

remained committed to making the projects work and spent the remainder of December 2024 and

January 2025 attempting to get the deal back on track.

53.    However, at every turn, Fleming refused to cooperate or negotiate terms in good

faith, and for reasons unknown at the time, seemed to want the deal to fail by continuing to propose

terms that were so unreasonable neither Nimol nor any other rational company could accept them.

54.    For example, although the original draft ESA between MPD and the Customer

contemplated only a $2,500,000 deposit from the Customer, on December 17, 2024, Fleming

proposed another ESA for Nimol's funding partner to enter, subject to future assignment to a new

customer, which required a $10,000,000 nonrefundable payment to MPD and $3,200,000

nonrefundable payment to UIG.

55.     Upon information and belief, there was no legitimate reason for UIG to receive payment under the ESA, as evidenced by the fact that the payment was not included in the ESA previously negotiated between MPD to the Customer, and if paid by Nimol's funding partner, would have resulted in an unearned, gratuitous financial benefit to Fleming through his direct or indirect ownership interest in UIG.

**VII.     MDT Defaults under the Marion PSAs for Failing to Close.**

56.     Despite Fleming's apparent desire to kill the entire deal, Nimol still ultimately wanted to exercise the EDC Marion Entities' contractual right to close on the Marion Properties. On January 22, 2025, Nimol's counsel notified Defendants' counsel of the same in writing, acknowledged that the respective closing dates were January 29 and February 10, 2025, and noted that Nimol would be flexible on the Marion Property, knowing Marion County first needed to sell the land to MDT.

57.     In response, Defendants' counsel stated on the same day there would be no closing because, among other reasons, (a) "[Nimol] was to have executed specifically delineated power agreements simultaneously to the contracts of purchase"; and (b) Defendants "directly communicated to [Nimol] that another party was prepared to execute a power agreement for the only available power reserved for the [Marion] Project, unless within the next ensuing week, [Nimol] itself finally so executed. With full notice having already had months to act, [Nimol] refused to execute the required power agreements, thereby refusing to act with said notice. The other party did execute the agreement for the available power upon [Nimol]'s refusal. There is no other power available as [Nimol] has been made aware."

58.     Nimol's counsel responded to Defendants' counsel and noted that no provision in the PSAs conditioned MDT's obligation to close on an end-user being in place, an executed ESA,

13

or power even being available at the time of closing. Thus, Nimol's counsel notified Defendant's counsel that the EDC Marion Entities still intended to close on the Marion Properties.

59.     After Nimol's counsel followed up with Defendants' counsel regarding closing on the Marion Properties three times, Defendants' counsel replied on January 28, 2025, that it would not close on the Marion Properties and also stated that Marion County "continue[s] to have concerns about providing free land without the considerations and validity of your client's project."

60.     On January 28, 2025, Nimol's Counsel sent a letter to Defendants' counsel providing notice of MDT's and the other sellers' defaults under all PSAs for failure to close on the Marion Properties (the "Notice of Default"). The Notice of Default further reiterated the parties' mutual understanding that the Marion Properties were a critical first stage to the overall development contemplated by the PSAs.

61.     On January 29, 2025, Defendants' counsel sent a letter purporting to provide its own notice of default and termination of the PSAs. Defendants' counsel's rationale was based on the false premise that failing to close on the sale of the Darlington, Dillon, and Bennettsville Properties constituted a default under the Marion PSAs. However, there is no term within any relevant PSA that relieved MDT of its obligation to close on the Marion Properties if the parties did not close on the Darlington, Dillon, or Bennettsville Properties.

62.     Because of the immense amount of time and millions of dollars Nimol had invested in the projects, and in spite of MPD's and MDT's bad faith and breaches of the PSAs, Nimol nevertheless continued attempting to negotiate a path forward with MPD and MDT.

63.     However, upon information and belief, Fleming never intended on agreeing to a reasonable resolution because Fleming decided to take the Marion Properties for his own benefit

so that he, MDT, and/or MPD could develop, own, and/or financially benefit in another data center project at the Marion Properties that does not involve Nimol.

## VIII.  MDT Purchases Marion Properties and New Data Center Project Advertised.

64.     Upon information and belief, MDT purchased the Marion Extension Property, on or around February 12, 2025.

65.     Upon information and belief, MDT purchased the Marion Property from Marion County on February 27, 2025, for $5.00.

66.     Upon information and belief, in connection with MDT recording its purchase of the Marion Properties in the public records, MDT improperly used surveys for the Marion Properties that were Plaintiffs' property, were prepared on behalf of and at great expense to the EDC Marion Entities, and were prohibited by the DDSA from being used for any purpose other than for Plaintiffs' benefit.

67.     Then, on or around April 24, 2025, Nimol came into possession of a promotional flyer for a proposed data center site in Marion County, stating that 400 acres were available with 400MW of immediately available power with ramp up to 500MW, an on-site substation deliverable in 18-24 months, and zoning and county approval.

68.     Notably, the advertised land was comprised of the Marion Properties and contained components substantially the same as the plans that were developed by Nimol at a significant cost. Upon information and belief, MDT, MPD, and/or other of their affiliates have improperly used Nimol's and the Customer's confidential and proprietary information to plan and advertise the proposed data center site in Marion County.

## FOR A FIRST CAUSE OF ACTION
### (Breach of Contract - Deposit Agreements)

69.     Plaintiffs reallege the foregoing paragraphs consistent with this cause of action as if fully restated verbatim herein.

15

70. The Deposit Agreements are binding enforceable contracts between MPD and EDC Marion and EDC Bennettsville.

71. EDC Marion and EDC Bennettsville have at all times performed under and in accordance with the Deposit Agreements.

72. Pursuant to the Deposit Agreements "**[i]f MPD is unable**, despite using commercially reasonable efforts, **to enter into an Electric Supply Agreement with [Nimol] and/or an Approved End User** equal to approximately [300 MW for Marion and 250 MW for Bennettsville] of generation capacity **as of December 1, 2024, the Transmission Capacity Reservation Charge shall be refunded to [EDC Marion and EDC Bennettsville] in full**, less reasonable costs incurred by MPD to the extent such costs have not already been recovered by MPD from [Nimol]. . . ." (emphasis added).

73. MPD breached the Deposit Agreements by, among other things, failing to refund the Capacity Deposits to EDC Marion and EDC Bennettsville after MPD was unable to enter the ESA with the Customer by December 1, 2024.

74. There was no legal justification for MPD's breach of the Deposit Agreements.

75. As a direct and proximate result of MPD's breach of the Deposit Agreements, EDC Marion and EDC Bennettsville have been damaged and are entitled to recover damages of at least $3,300,000, which was the amount of the deposits; interest; attorneys' fees; and other consequential damages to be determined by the trier of fact.

## FOR A SECOND CAUSE OF ACTION
### (Breach of Contract - Marion PSAs)

76. The Marion PSAs are binding enforceable contracts between MDT and the EDC Marion Entities.

77. The EDC Marion Entities have at all times performed under and in accordance with the Marion PSAs.

78.    The EDC Marion Entities satisfied all their conditions for MDT to close on the sale of the Marion Properties.

79.    MDT breached the Marion PSAs by failing to close on the Marion Property by January 29, 2025, and by failing to close on the Marion Extension Property by February 10, 2025.

80.    There was no legal justification for MDT's breach of the Marion PSAs.

81.    As a direct and proximate result of MDT's breach of the PSAs, the EDC Marion Entities have been damaged and are entitled to recover the at least $120,000 earnest money deposit for the Marion Extension Property, all consequential damages, and all other third-party costs and expenses incurred by the EDC Marion Entities in connection with the Marion PSAs and the Marion Properties, in an amount to be determined at trial, plus attorneys' fees and costs.

**FOR A THIRD CAUSE OF ACTION**
**(Breach of Contract - DDSA)**

82.    Plaintiffs reallege the foregoing paragraphs consistent with this cause of action as if fully restated verbatim herein.

83.     The DDSA is a binding enforceable contract between Nimol and MDT.

84.    Nimol has at all times performed under and in accordance with the DDSA.

85.    MDT breached the DDSA by using Nimol's Confidential Information for the improper purpose of, among other things, Fleming, MDT, and/or MPD developing, owning, and/or financially benefiting from another data center project that does not involve Nimol at the Marion Properties.

86.    There was no legal justification for MDT's breaches of the DDSA.

87.    As a direct and proximate result of MDT's breach of the DDSA, Plaintiffs have been damaged and are entitled to recover actual and consequential damages in an amount to be determined at trial.

<u>**FOR A FOURTH CAUSE OF ACTION**</u>
**(Breach of Contract Accompanied by a Fraudulent Act)**

88.     Plaintiffs reallege the foregoing paragraphs consistent with this cause of action as if fully restated verbatim herein.

89.     As set forth above, MPD and MDT breached the Deposit Agreements, the Marion PSAs, and the DDSA (the "Agreements") without legal justification.

90.     MPD and MDT breached their obligations under the Agreements with fraudulent intent and by way of fraudulent acts, including, but not limited to, the following dishonest, unfair, and unlawful acts:

a)     Falsely representing that Marion County required that the Marion Property first be conveyed to MDT before being conveyed to EDC Marion;

b)     Failing to negotiate the ESA with the Customer or Nimol's funding partner in good faith;

c)     Falsely representing that there was no more available power to service the Marion Property;

d)     Purchasing the Marion Properties for itself after fabricating false and pretextual reasons as to why the EDC Marion Entities were not entitled to purchase the Marion Properties;

e)     MDT's and/or MPD's use of Nimol's Confidential Information to develop, own, operate, and/or participate in a data center project without Nimol's involvement at the Marion Properties; and

f)     Such other fraudulent, dishonest, unfair, and unlawful acts related to the breach that may be revealed in the course of discovery.

91.     As a direct and proximate result of MPD's and MDT's fraudulent acts that accompanied their breaches of the Agreements, Plaintiffs have suffered actual and consequential

damages, in an amount to be determined at trial, and are further entitled to recover punitive damages for MPD's and MDT's willful, wanton, and reckless conduct.

**FOR A FIFTH CAUSE OF ACTION**
**(Unfair Trade Practices)**

87.     Plaintiffs reallege the foregoing paragraphs consistent with this cause of action as if fully restated verbatim herein.

88.     MPD's and MDT's conduct throughout the diligence process was offensive to public policy, immoral, unethical, oppressive, unfair and deceptive to the Plaintiffs in at least the following ways and particulars:

a)     Falsely representing that Marion County required that the Marion Property first be conveyed to MDT before being conveyed to the EDC Marion Entities;

b)     Failing to negotiate the ESA with the Customer or Nimol's funding partner in good faith;

c)     Falsely representing that there was no more available power to service the Marion Properties;

d)     Purchasing the Marion Properties for itself after fabricating false and pretextual reasons as to why the EDC Marion Entities were not entitled to purchase the Marion Properties;

e)     MDT's and/or MPD's use of Nimol's Confidential Information to develop, own, operate, and/or participate in a data center project without Nimol's involvement at the Marion Properties; and

f)     Such other deceptive and unfair acts that may be revealed in the course of discovery and at trial.

89.     MPD's and MDT's conduct has an impact on the public interest in the following ways and particulars:

a)     MPD's and MDT's conduct is capable of repetition and likely to be repeated;

b)     MPD's and MDT's conduct directly and indirectly affects the public interest of South Carolina because of the significant property tax revenue associated with the development of data centers, the number of jobs created in a locale as a result of the construction and development of data centers, the corresponding infrastructure development that accompanies the construction and development of data centers; and the position of the State of South Carolina as a leader in the development of technology based businesses, and in such other ways and particulars as will be shown in discovery and proven at trial.

c)     As an electric cooperative, which is owned by its membership, MPD's actions necessarily affects the public interest because its mission is to act in the best interests of its members.

90.     As a direct and proximate result of MPD's and MDT's unfair trade practices, Plaintiffs have suffered actual and consequential damages, in an amount to be determined at trial, and are further entitled to recover punitive damages, treble damages, reasonable attorneys' fees, and costs as provided for by the Unfair Trade Practices Act.

## FOR A SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

90.     Plaintiffs reallege the foregoing paragraphs consistent with this cause of action as if fully restated verbatim herein.

91.     By virtue of the Due Diligence Services Agreement between Nimol and MDT, MDT agreed to serve and did serve as Nimol's agent for the purpose of providing "[a]ny and all services and information that may be commercially required or otherwise necessary by [Nimol] .

. . to enable [Nimol] to conduct their master planning of the Project to include the development of all of the campuses."

92.    By virtue of this agency relationship, MDT obtained significant confidential data from Nimol related to the intricacies of Nimol's business "including, but not limited to, products, information relating to [Nimol]'s prospective and existing customer lists, operations, facilities, computer systems, finances, product development plans, and business directions or marketing plans."

93.    A fiduciary relationship existed between Nimol and MDT by virtue of MDT's status as the agent of Nimol.

94.    MDT owed a duty of care, loyalty, and candor to Nimol. In particular, MDT was obliged to act in the best interests of Nimol and not to engage in any self-dealing.

95.    MDT breached its fiduciary duty to Nimol in the following ways and particulars:

a)    Obtaining information about Nimol's strategic plans and business and using them to further MDT's own business interests;

b)    Failing to ensure and actively opposing Nimol's efforts to obtain property and other agreements that would further its plans to develop the aforementioned data centers in South Carolina;

c)    Failing to maintain the confidentiality of Nimol's proprietary information;

d)    Using Nimol's Confidential Information for the improper purpose of, among other things, developing, owning, and/or financially benefiting from another data center project that does not involve Nimol at the Marion Properties; and

e)    In such other ways and particulars to be shown in discovery and at trial.

96.    Nimol has been damaged and is entitled to actual and consequential damages from MDT in an amount to be determined at trial based upon Nimol's financial losses, lost business

opportunities, and in other ways as will be shown in discovery and at trial. Nimol is also entitled

to recover punitive damages for MDT's willful, wanton, and reckless conduct.

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)     Enter judgment in favor of Plaintiffs and against Defendants;

(b)     Award Plaintiffs their actual, compensatory, statutory, and punitive damages in an amount to be determined at trial, but no less than $75,001.00;

(c)     Award Plaintiffs their attorneys' fees, costs, and expenses;

(d)     Award Plaintiffs pre- and post-judgment interest as allowed by law;

(e)     Award Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted,

s/Walter H. Cartin
Walter H. Cartin (Fed. ID No. 10772)
Adam J. Neil (Fed. ID No. 7857)
J. Evan Phillips (Fed. ID No. 13005)
PARKER POE ADAMS & BERNSTEIN LLP
1221 Main Street, Suite 1100
Columbia, South Carolina 29201
T: 803-255-8000
waltcartin@parkerpoe.com
adamneil@parkerpoe.com
evanphillips@parkerpoe.com

*Attorneys for Plaintiffs*

June 24, 2025
Columbia, South Carolina